May it please the Court, I'm Julie Hall on behalf of Mr. Moormann. I'd like to reserve five minutes of my time for rebuttal. We're here on Mr. Moormann's motion for stay of execution and motion to authorize the filing of a second habeas petition in the Federal District Court. The test for this Court to apply in examining that motion, the motion to authorize, is a prima facie, a first look at whether we have made sufficient allegations of fact with some documentation that would warrant a fuller explanation in the District Court. A standard that's been described by the Federal Courts is very similar to the standard for granting a motion for certificate of appealability. We have indeed offered that evidence and made those allegations. As to the first issue, Mr. Moormann's mental retardation under Atkins v. Virginia, this is a, under 2244B1B, under Chapter 28 of the U.S. Code, the facts, if proven, established by clear and convincing evidence that no reasonable fact finder would have found Mr. Moormann guilty of capital murder. And given his mental retardation, and to be clear, this claim is that Mr. Moormann is mentally retarded, which prohibits his execution. And we believe, similar to a claim of incompetency, it's actually a sort of a two-part claim, or two separate claims, and one is at the time of trial and sentencing. Although we do believe Mr. Moormann has suffered from and will be diagnosed as suffering from mental retardation throughout his life, that question at this point is almost beside the point, not completely, but almost beside the point, because he is mentally retarded today and, therefore, not eligible for execution. Is there a case that has held that, that is that even though the person was competent to stand trial and was not retarded at the time of sentencing, that he can claim deterioration at a later time? I'm not aware of one, Your Honor, and that's pretty unexpected. I think these are very unique circumstances, very unlikely to occur often, if ever, again. And that is because mental retardation is a developmental disorder. There's no question that, for example, if I tomorrow were in a car accident, I won't say my age, but I am over 18, were in a car accident, suffered brain damage that lowered my IQ to such a point that it was below some standard that could be determined to put me in the category of mental retardation. I could not be diagnosed as mentally retarded because that is not a developmental disability. Mr. Moormann's case is so unique because he has functioned his entire life at a very low intellectual level. He's been diagnosed as mentally retarded, and what's happened is not only did Mr. Moormann change, but the standard changed. So from a diagnostic perspective, from a mental health perspective, he was mentally retarded the whole time. The problem was until Arizona passed its statute, that particular diagnosis didn't matter. It was that evidence was mitigating either way, and it didn't preclude the death penalty either way. Let me ask you then, just to make sure I understand, I hear you both saying that not only is there a degradation possibility, if I heard you, but that also because of the statute, he wouldn't have been benchmarked against the current statute. Is that right? Well, I think it's a difficult question to answer, Your Honor, because there hasn't been a full hearing on his mental retardation. There are certainly diagnoses of mental retardation pretrial, so I don't think it's fair to say that had that issue been raised at the time, that he wouldn't have met whatever the theoretical standard at the time would have been. So what do we do with, you know, it's a state standard, we've had the Arizona Supreme Court. Is there anything that would tell us that we're not to pay deference to their ultimate determination? Is this case unusual in some way? It is unusual. Well, what the Arizona Supreme Court has done, although there is a petition for review pending in the Arizona, as far as I know it's still pending in the Arizona Supreme Court, what they've done is rule on the motion for stay that was previously filed. But what they did in ruling on that motion was they ignored the definition that's contained in their own statute. They said essentially that mental retardation is sort of a static disorder that doesn't ever change. And so prior to the age of 18, whatever your IQ is essentially is the end of story. What the court ignored in the state statute is the word onset, and that is the requirement that the disorder onset before the age of 18. And in Mr. Mormon's case, it's unquestionable that it did. He had a very serious developmental disability. It onset probably from the time of birth, if not before. And what Arizona could have put into its statute, had it chosen to, would be a different requirement. Say, for example, that the developmental disability manifested fully before the age of 18. In other words, that the IQ number and the sub-average intellectual functioning and the substantial deficits in adaptive behavior all fully manifested before the age of 18. But their own definition only requires that those things onset before the age of 18. And in Mr. Mormon's case, they all did. Well, what do you say to the documentation that the state has provided that he was examined and tested and that he didn't show that he was below the level that the state statute would require from mental retardation? That was a report of one doctor that is not supported by any, we don't have any of the raw data, testing scores. So again, it would take a full hearing to analyze exactly those findings. It's not uncommon in these cases to have one or two outlying IQ scores because IQ is just a number. And in fact, there's a range depending on what test is given, what version of the test is given. There's a whole range of numbers. In fact, if we take a guess at what test might have been given at that time or the version that might have been given, there's a failure even in that number to adjust for practice effect and the Flynn effect and the standard error of measurement within that test. And so the fact that that one score is contrary to really Mr. Mormon's entire social history, the diagnosis of many other mental health professionals, and it's contrary to the two mental retardation diagnoses he had prior to the age of 18, I don't believe that test is enough to overcome the showing that we've made here to prevent the filing of that test. Well, the showing that you've made here is, do I misunderstand it? I thought it was an affidavit of a psychologist that if there were further time and resources that he, in his opinion, thought that he would test out as meeting the statutory standard for mental retardation. So you don't even have one psychologist who has done sufficient testing to render an opinion that he is. He was diagnosed as mentally retarded both by Catholic Social Services at the age of around 13 or 14 and again by the Arizona State Hospital at the age of 14 or 15. Those records are contained, discussed in the expert declarations that we filed with the court. And so Dr. Weinstein's opinion is not based only on the evaluation he did in late January to obtain those IQ scores, but also all of the declarations by the experts that talk about Mr. Mormon's adaptive functioning over the years. And they do establish a prima facie case of mental retardation under the Arizona statute and under Atkins. Well, this claim could have been brought out a long time ago. The problem is the Arizona statute prohibited it because the Arizona statute required a particular IQ number, which we didn't have and arguably didn't exist, although it's difficult to say how much of the damage to Mr. Mormon's intellectual functioning was prior to his stroke and how much was prior to his cardiac bypass surgery. And when you're a lawyer representing someone of very low intellectual functioning, it's difficult to see when it slips just a little bit one way or another. Perhaps if he'd been very high functioning before, we might have seen more of a difference, but following the stroke and the heart surgery. But it was difficult, and it wasn't until we began to prepare for clemency and to think about potential challenges to the lethal injection procedure that we began to discover the possibility of the existence of this evidence. So I don't believe it could have been brought based on the record we had with the IQ numbers of 86 and 94. We didn't have any evidence to indicate to us that we would qualify under the statute. Again, always believing that in fact, diagnostically, Mr. Mormon does suffer from mental retardation. That was a completely separate question from can we bring a challenge under the statute. And so until the fall of 2011, there was simply nothing to indicate to us that we could bring a potentially successful challenge under the Arizona statute. The claim regarding post-conviction counsel under Maples and Martinez is supported by the declaration of Alan Gearhart. And I should point out to the court that the motion to vacate the judgment under Rule 60B-6 in the district court has been denied and appealed to this court, which may be a separate issue or it may inform this court in the consideration of that claim. But we believe Mr. Mormon has also made a showing, a prima facie showing, to be authorized to file a successive habeas petition, a second habeas petition, regarding that claim under 28 U.S. Code 2244b2a, where Maples, and again the claim also relies potentially on Martinez, which I think is grounds for the court to grant a stay, knowing that the Supreme Court's decision in Martinez is imminent and will further inform the consideration of this claim. But even under Maples, Mr. Mormon is entitled to a stay because Maples establishes a new rule of constitutional law. Although Maples deals with the issue of cause and prejudice in Federal court, the Supreme Court has previously said cause related to counsel to qualify as cause has to be based on a claim that would have a constitutional basis for ineffective assistance of counsel. And so Maples established that there is some, although the contours maybe haven't been well-defined yet, but some right to effective counsel in state post-conviction. And so that's the rule that applies here. And under B2A, it has been made retroactive by strict logical necessity under Tyler v. Kane because it was announced in a habeas case and it is a rule that will only apply in post-conviction and habeas cases. Do you characterize that as a right to effective representation of counsel? Because I thought that what happened in Maples was that he didn't have any representation. It is some, and you're right, Your Honor, that I don't know if effective is the right word to use, and we may not know that until we see Martinez, but there is some right. So you're talking about Martinez. Yes. Okay. Yes, Your Honor. But there is, even in Maples, there is some Federal constitutional right there, otherwise it wouldn't be sufficient to establish cause in Federal court under the Supreme Court's prior precedent. And the standard they established, there was abandonment, and Mr. Mormon certainly meets that standard. He had a lawyer who essentially did not know the primary purpose of state post-conviction, and that is to investigate the case and raise claims outside the record. He thought his job was to sort of redo the appeal that had been done before, and so it resulted in abandoning his role as a post-conviction lawyer. He essentially was serving as another direct appeal lawyer in the case. I'd like to address just the standard for a stay under barefoot, substantial grounds upon which relief might be granted,  And that, I think, as I've discussed, is apparent in this case, that Mr. Mormon can establish that he – there's a strong likelihood that he will establish that he is mentally retarded and therefore exempt from execution. And, of course, the other factors to consider are the irreparable injury, absent a stay, and, of course, there can be no irreparable injury higher than the one at stake here. And also that there is no substantial injury to other parties absent a stay. Mr. Mormon will remain in prison, and should he not prevail on his second habeas petition, he would still be subject to execution at a later time. So the state essentially is merely inconvenienced, and that has to be balanced against the risk of executing a man who, under Maples and Martinez, should not have been subjected to the death penalty in the first place, and under Atkins should not be subjected to execution. And, of course, the public has no interest in executing a man who is so intellectually disabled that he doesn't even qualify for the purposes of the death penalty to begin with. If the court has no other questions. Good. Did members of the panel have any questions? No. I guess I should just briefly address the standard for a motion to recall a mandate. And, again, I think Mr. Mormon prevails under either standard, whether it's the standard under Calderón v. Thompson here, or because the execution of a person with mental retardation does meet the miscarriage of justice standard, or because this isn't a sua sponte recall of the mandate, the standard, we argue, is extraordinary circumstances because the court would be acting on a motion rather than sua sponte. And I think all of the circumstances in this case, the abandonment by post-conviction counsel and his mental retardation, the potential execution of a mentally retarded man, establishes the extraordinary circumstances that make it appropriate to recall the mandate. And, of course, if this court views, you know, in the context of the motion to recall the mandate, that Maples is actually a change in procedural law, and therefore not appropriate for the second or successive petition as a procedure, as a proper procedure, then we'd urge you to stay the execution and remand to the district court for consideration under Rule 60b-6. Okay, well, what do we do with the fact, as I understand, that the district court has already denied the 60b motion and you have appealed that? I'm not sure I understood the question. I thought that Judge Silver ruled this morning on the 60b motion. She did, Your Honor, and I guess that gives this court... I understand you're appealing that. That's right, and the opening brief was filed this afternoon. Right. And what it does is it gives this court whichever vehicle is the proper one for these claims reaching federal court. So you want to see them recalled, the mandate, or reversed? And whether it's a second habeas petition or a motion under 60b-6, I think really depends on whether the court views Maples as a substantive change in the law and creating that new constitutional right, or whether the court views Maples as a procedural change which just allows habeas petitioners to establish cause and prejudice. If it's a procedural change, then as Judge Silver recognized, it is appropriate as a 60b-6 motion. And then the only question for the court to answer would be whether Judge Silver abused her discretion in finding that post-conviction counsel did not abandon Mr. Moorman, as we think he clearly did, by not even knowing what his role was in the case. And, of course, if the court thinks it's a, as I've discussed, if the court believes that Maples is actually a substantive change, a new constitutional right, then it is proper to proceed under the other vehicle, the second habeas petition. Thank you. Thank you. May it please the Court. John Todd with the State of Arizona. As to the first claim that counsel discussed, the Atkins claim, the clearly established Supreme Court law that would be in play at all here would be Atkins and Ford. They have made no Ford claim, so we look at Atkins, and Atkins requires three elements, the IQ, the behavior, and an onset before 18. And in this record, fortunately, we have evidence from the 1972 kidnapping case, and then again from the 1985 murder case, 84-85 murder case, that he did not, Mr. Warren, didn't meet the IQ requirements. So, as I understand the pleadings, Dr. Weinstein's position would be, well, his bypass surgery in 07 and his recent stroke, or maybe I have it vice versa, his recent stroke in 2011, was what caused his IQ numbers to go down. So, obviously, that fact in itself shows that he was not mentally retarded at the time. The doctors that examined him in 2000, excuse me, in 1972, had the opinion that he was given to parap... using this reputation that he had to be retarded to his advantage. I believe that's in the records. The argument here today, which I'm not sure I was clear was in the briefs, is that he was mentally retarded as a child. As I understand it, he was tried and convicted three years after Atkins was decided. He was tried and convicted three years after Atkins... Was decided, if I recall correctly. Atkins was decided in 2002. And he was examined in 85 and 72, so long before Atkins. And his most recent examination has been when? End of January, by their expert. But as I heard counsel, one aspect of the argument was that at age approximately 13, he had documentation of an onset of mental retardation. What is your response to that? My understanding of the record, Your Honor, is that there were... I don't recall anything in the record showing any sort of formal diagnosis. There were opinions of people that he was mentally retarded. I believe his adopted mother had that opinion. But when he was tested, it showed that he was not. So, your position is So, your position is that if there's not documentation before age 18, if somehow it's medically possible to deteriorate to the point of retardation post-18, that it wouldn't matter, he could still be executed even though he is officially mentally retarded? Our position is, Your Honor, that under the clearly established Supreme Court law, being if he was so mentally deteriorated that he meets the forward competency standard, he could not be executed. However, Atkins applies at the time of the crime and at that time, his own expert emphatically testified that he was not mentally retarded. Counsel, what do we do with the Arizona Supreme Court determination regarding this issue? My understanding is while they have recently denied the stay, the Court has not actually ruled on the petition for review. In the Supreme Court's decision on the first motion to stay, when I said they ruled on the second motion, I mean, this afternoon they denied the second motion to stay. But as to the first motion, they found that the first claim, Maple's claim, was precluded. And they discussed the Atkins claim as not meeting the requirement of the Arizona Post-Conviction Relief Statute that would show that he was innocent of the death penalty. Did the Supreme Court make a ruling regarding the onset of mental retardation later in life? I don't believe it in their ruling denying the stay that they specifically addressed that. Didn't they discuss the statute? They did discuss the statute, yes. And I guess they were looking at, in effect, kind of a preliminary injunction type standard there of likelihood of success under the statute? That was the language that they used, yes, Your Honor. So they were saying under the statute, under Atkins, and then under the Arizona statute, which has this definition that there wasn't a likelihood of success. That's correct, Your Honor. Is that a legal finding or a mixed factual legal? What kind of finding is that? I would say at very least it's a finding by a state court based in state law. And of course, the way the Arizona statute defines mental retardation is not unusual at all. It's a common definition. It's similar to the Atkins situation in terms of the under 18? Correct. And Atkins had an IQ when tested of IQ was 59. Did the Arizona Supreme Court make a definitive statement that mental retardation cannot develop later in life? You don't remember if the Arizona Supreme Court made that definitive statement? I don't believe the Arizona Supreme Court has made that definitive statement. It wasn't expressing a medical opinion, I assume. No. It was dealing with the Arizona statute. Right. Concerning the Maples claim, in order to file a successive habeas petition, they would have to establish that there has been a change of the law that would entitle them to raise a new claim, a change of law by the Supreme Court made retroactive. Here, what the Supreme Court decided in Maples simply was that they applied existing law as to cause and said that in the performance, these two attorneys, their lack of performance, was so significant that it constituted a total abandonment of their client without his knowledge. And based on that, they found the procedural aspect that he met the cause test. They never created a new cause of ineffective assistance of counsel on post-conviction relief status. That case didn't do it. So it has no effect on these proceedings, even if their affidavit from Mr. Gerhardt from January of 2012 showed that he abandoned his client. And it doesn't. The record that this Court has had previously on two occasions shows that Mr. Gerhardt proceeded with his Rule 32. The only claim that they would want to raise is that he was somehow constitutionally ineffective. And that Coleman prohibits. So there's no basis. What effect do you think the pending Supreme Court decision in Martinez would have on this case? It depends on how the Supreme Court decides the case. So should we say the execution? No. Absolutely not, Your Honor. Well, if your answer is that we don't know what effect it will have until the Supreme Court rules, why should we take the chance that Mr. Mormon would be executed before we can find out what that ruling is? Because the ruling, whatever it might be, is so far removed from the main event, from the fact that he was tried and convicted of a horrific, horrible crime, that he had a fair trial by what every court has reviewed, have not found that he's been prejudiced in any manner. There's absolutely no reason to postpone further. Well, counsel, if I understand Martinez, and I haven't read it recently, but the issue before the Supreme Court, as I understand it in Martinez, is whether someone has a right to effective counsel in the first opportunity that he has to challenge the effectiveness of counsel. You're absolutely correct, Your Honor. And as you pointed out in the decision in Mormon, his first opportunity to challenge his effectiveness of trial counsel was during his direct appeal. And it was for that reason that you permitted his counsel to go back to district court and try to show that his appellate counsel was constitutionally ineffective in failing to raise the claim of trial counsel. So in effect? It would have no effect on this court. We've already taken into account the principles. He's already had a merits hearing on that point, in effect. As to the issue that was preserved below, that they claim that he had not followed through on the sentencing counsel claim. Is that clear? In any event, as the court reminds me, Martinez would not affect this case. So now you've refined your answer. Say again? You've refined your answer. Yes, Your Honor. And then as far as the stay and recalling the mandate, there's no merit to either of these claims. The district court found there was nothing extraordinary about them. And there's no reason to issue a stay. If the court has no further questions. Are there any further questions from the panel? No. I have none. Thank you. Thank you. The problem with relying on the McGurl and Oberbeck IQ tests, there are a few. The main ones are those tests were never subjected to any kind of scrutiny. They weren't contested because at the time, essentially IQ didn't matter. It was almost two decades pre-Atkins that these tests occurred. And so because they've never been analyzed and they've never been contested, we just don't know if they're reliable until a full hearing is held. And they also require to buy into those two IQ numbers. You have to ignore everything else in the record that we know about Mr. Mormon. And they simply appear to be very unreliable numbers given everything else in his history. And finally at the time, and I think this is discussed in Penry, although I apologize I didn't look, mental retardation, one of the problems with it was that it could potentially be viewed as aggravating. So for a trial lawyer at the time to concede that his client was not mentally retarded back in 1985 absolutely does not mean that the client is not mentally retarded. It means that the trial lawyer may have been concerned about that diagnosis being considered as aggravating. So there are problems with those IQ tests that make a hearing necessary. The respondents say that there was no formal diagnosis and say that Mr. Mormon's mother thought he was mentally retarded. There in fact are diagnoses by mental health experts in the record. The Arizona State Hospital diagnosed Mr. Mormon as mentally retarded. I'd be shocked if they did it just by looking at him rather than doing formal testing. That would have been completely unethical. And the same with Catholic Social Services. He did receive that diagnosis. The passage of time makes it difficult to recover the testing data in these cases, but nevertheless they were formal diagnoses. What do we do with the Arizona Supreme Court where they say, well let's assume in effect that it's under 70, but you still have this clear and convincing standard regarding intellectual disability. And Dr. Weinstein's affidavit doesn't actually meet that standard. What is your response to that and how, in your view, would a federal appellate court be able to sidestep that ruling? I'm not sure, are you referring to the ruling on the stay motion or the ruling that I have a feeling I haven't seen from this afternoon on the petition for review? Oh, maybe that's, let's see, this is... In any event, I'd like to take a stab at it. This is the 224 ruling. Friday's ruling. Okay. This is the stay motion. Okay. Friday's ruling. The problem with the Arizona Supreme Court's opinion is that there's nothing in the record at this point to contradict Dr. Weinstein's affidavit. And so it is clear and convincing evidence of what Mr. Mormon's IQ is now. And I don't believe that respondents have disputed at all that Mr. Mormon's IQ is presently somewhere in that range of 63 to 72. What they're disputing is that IQ, essentially the meaning of the word onset, and that is that Mr. Mormon's IQ, sub-average intellectual functioning, and that IQ number did not... Their argument, I think, is that it didn't fully manifest before 18, but of course that's not what the Arizona statute requires. And so I think that the Arizona Supreme Court opinion is just not supported by the record, by the facts before it. But beyond that, it's really at this stage not for this court to make a determination of whether the state court was right or wrong. It's only to make this determination of whether the evidence is sufficient to require a full consideration by the district court, which of course under 2254 will make a full consideration about the proceeding on the second habeas petition. But at this point, it's really just that look at the face of things that this court should take to decide that we have enough to proceed. Respondents are actually incorrect that Arizona is not unusual in its... that it uses this common definition as onset. In fact, most states use the word manifest, and Missouri uses the word originates. But almost all other states use manifest before the age of 18, and so Arizona's standard is actually lower than most other states in terms of that, only requiring that the disability begin or start prior to the age of 18. Well, I guess I still am having trouble with dates this afternoon, but the first habeas petition was filed after Adkins was decided, was it not? No, Your Honor, the first habeas petition was filed in 1991. No, in federal court. In 1991, the first habeas petition, so about 11... And then it got stayed because of various things that were related. That's right, 11 years before Adkins was decided, the first habeas petition was filed. To the state's point on Maples, the state pointed out that Arizona precluded, the Arizona Supreme Court precluded consideration, although it precluded it based only on, and again, I haven't seen what may be a later order this afternoon, but in the stay motion, it precluded it based on Rule 32.2A, which under the Arizona rules does not result in a procedural default in state court. And again, for this court's prima facie look, it's probably not relevant at all whether the claim would ultimately be procedurally defaulted by the district court, but here it's plain that it would not be. And as to the merits of the Maples claim, the state argues that the attorney here did something for Mr. Mormon. He filed a petition. And in fact, the attorneys in Maples did a lot for their client, presumably this large firm that represented him all the way through the lower court in Alabama did the investigation that was required. They knew that they could raise claims outside the record. They did, in fact, much more for their client. They only, in Maples, they only failed their client in one aspect of the representation, and that was in filing a notice of appeal. Here, although Gearhart filed the petition repeating everything that had been done before, essentially repeating the direct appeal and the conflicted lawyers post-conviction petition, he failed him. He abandoned Mr. Mormon in a much more complete respect than the attorneys in Maples did. And the reason Mormon, one, doesn't resolve this question is because in Arizona, there has never, even at the time of Mr. Mormon's direct appeal, there has never been a mechanism for investigating ineffective assistance claims on direct appeal. That's why the rule changed, because the system didn't work. So what you had was a system, a rule that said you've got to raise your ineffective assistance claim here, but in fact, it couldn't be done because you couldn't investigate. You could raise record-based claims only. So in Mr. Mormon's case, where he had the conflicted counsel in the first post-conviction, which this Court resolved that issue in Mormon one, that only went to record-based ineffective assistance of counsel claims and the ineffective assistance of counsel on direct appeal. What the Gearhart petition was the first opportunity that Mr. Mormon ever had and has never had since to raise claims of ineffective assistance that were based outside the record. And in Mr. Mormon's case, those were the most important claims in his case. And of course, the resulting procedural default in Federal court meant that they still, to this day, have never been considered. And if the Court has no further questions, I would just ask the Court to grant the motion to stay and remand to the district court for consideration of the second habeas petition, or to recall its mandate or remand to the district court for appropriate consideration of the 60 v. 6 motion. Thank you. Are there any further questions? No. No. If I, just so I'm sure I didn't misspeak, I received notice that the Arizona Supreme Court denied the second stay motion. I did not, I don't know one way or the other concerning the petition for review. Okay. So I just wanted to be sure I didn't misspeak. Okay. All right. The matters just argued are submitted for decision. And the Court stands adjourned for this session. And will you please disconnect all of the, ask our technical assistant here. I will depart and come back, and you will unhook everything so that we are only talking to each other. That's correct. Thank you. The Court stands adjourned.
judges: Schroeder, McKeown, Rawlinson, Cjj